*Lodged proposed Order*

1   PETER R. AFRASIABI (S.B. #193336)
    JOHN TEHRANIAN (S.B. #211616)
2   TURNER GREEN AFRASIABI & ARLEDGE LLP
    535 Anton Boulevard, Suite 850
3   Costa Mesa, California 92626
    Telephone: (714) 434-8750
4   Facsimile: (714) 434-8756

5   Attorneys for Defendants
    CHIP WARNER and CONVIVIA, INC.

6

7

8              UNITED STATES DISTRICT COURT

9      CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10

11  SHARMAN NETWORKS LIMITED,          Case No.  SACV 04-1212 CJC (Anx)
    a Vanuatu corporation; and
12  SHARMAN LICENSE HOLDINGS           **WARNER AND CONVIVIA,**
    LIMITED, a Vanuatu corporation,    **INC.'S NOTICE OF MOTION**
13                                     **AND MOTION TO DISMISS**
                                       **WITH PREJUDICE PLAINTIFF**
14              Plaintiffs,            **SHARMAN NETWORKS**
                                       **LIMITED'S FIRST CAUSE OF**
15        v.                           **ACTION IN THE FIRST**
                                       **AMENDED COMPLAINT;**
16  CHIP WARNER, an individual, dba    **MEMORANDUM OF POINTS**
    DIETK.COM; CONVIVIA, INC., a       **AND AUTHORITIES IN**
17  California corporation; and DOES 1 **SUPPORT THEREOF**
    through 50, inclusive,
18                                     **[Declaration of John Tehranian and**
                Defendants.            **[Proposed] Order filed and lodged**
19                                     **concurrently]**

20                                     Date:      November 15, 2004

21                                     Time:      ~~10:00 a.m.~~  1:30 P.M

22                                     Courtroom: 9B

23  **TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**
                                              1:30 P.M
24       PLEASE TAKE NOTICE that on November 15, 2004, at ~~10:00~~ a.m. or as

25  soon thereafter as the matter may be heard, in the Courtroom of the Honorable

26  Cormac J. Carney, United States District Judge for the Central District of

27  California, Southern Division, located at 411 West Fourth Street, Santa Ana,

28  California, Defendants Chip Warner and Convivia, Inc. will and hereby do move

4946                      1          **WARNER AND CONVIVIA'S MOTION TO**
                                     **DISMISS FIRST CAUSE OF ACTION**

1   the Court pursuant to Federal Rule of Civil Procedure 12(b)(6) for an order

2   dismissing with prejudice Sharman Network Limited's first cause of action for

3   tortious interference with contractual relations in the First Amended Complaint for

4   failure to state a claim for relief as a matter of law.

5          Pursuant to Local Rule 7-3, Counsel for Defendants provided notice of this

6   motion to Plaintiffs' counsel on October 18, 2004.

7          The Motion will be made for all of the reasons set forth in the accompanying

8   Memorandum of Points and Authorities, this Notice, the Declaration of John

9   Tehranian, the files and records on file with the Court in this action, and any

10  additional arguments that may be presented to and received by the Court.

11

12  Dated:   October 19th, 2004        TURNER GREEN AFRASIABI
                                       & ARLEDGE LLP
13                                     PETER AFRASIABI
14                                     JOHN TEHRANIAN

15

16                                          John Tehranian
                                       Attorneys for Defendants
17                                     CHIP WARNER and CONVIVIA, INC.

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................. 1

II.   BACKGROUND ................................................................. 1

    A.    Diet K and the Kazaa Media Desktop ................................ 1

    B.    SNL's First Cause of Action .......................................... 2

III.  RULE 12 STANDARDS ....................................................... 3

IV.   DISCUSSION .................................................................. 3

    A.    Plaintiff's Interference with Contract Claim Fails as a Matter of Law Because the Cause of Action Is Preempted Under the Federal Copyright Act. ................................................... 3

    B.    Plaintiff's Interference with Contract Claim Fails as a Matter of Law Because, by Plaintiff's Own Admissions, There Is No Valid Underlying Contract to Enforce. ...................................... 7

V.    CONCLUSION .................................................................. 10

i

# TABLE OF AUTHORITIES

## CASES

*Adobe Sys. Inc. v. One Stop Micro, Inc.*, 84 F. Supp. 2d 1086, 1089 (N.D. Cal. 2000) .................................................................................. 5

*American Int'l Pictures, Inc. v. Foreman, 576 F.2d 661, 663-64 (5th Cir. 1978)* ......................................................................................... 5

*American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9ᵗʰ Cir. 1988) .................. 8

*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)............................. 3

*Burke & Van Heusen, Inc. v. Arrow Drug, Inc.*, 233 F. Supp. 881 (E.D. Pa. 1964) ......................................................................................... 7

*Jones v. Vilsack*, 272 F.3d 1030, 1034 (8ᵗʰ Cir. 2001) .......................................... 4

*Lockyer v. Dynergy, Inc.*, 375 F.3d 831, 852-53 (9ᵗʰ Cir. 2004).............................. 3

*Lopez v. Smith*, 160 F.3d 567, 571 (9ᵗʰ Cir. 1998) .............................................. 3

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001)..................................... 4

*McGee v. International Life Ins. Co.*, 355 U.S. 220, 223 (1957)................................ 9

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, Case No. CV 01-8541-SVW (PJWx) (C.D. Cal), ...................................................... 7

*MGM Studios Inc. v. Grokster, Ltd.*, 243 F. Supp. 2d 1073, 1087 n.8 (C.D. Cal. 2003) ................................................................................ 8

*Richardson v. La Rancherita La Jolla, Inc.*, 98 Cal. App. 3d 73, 81 (1980)................... 3

*Softman Productions Co., LLC v. Adobe Systems, Inc.*, 171 F. Supp. 2d 1075 (C.D. Cal. 2001) ........................................................................ 6

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975) .......................... 5

*Vault Corp. v. Quaid Software, Ltd.*, 847 F.2d 255 (5th Cir. 1988) .......................... 4, 5

## STATUTES

17 U.S.C. § 109(a)........................................................................... 5

17 U.S.C. § 301(a)........................................................................... 4

## OTHER AUTHORITIES

Restatement (Second) of Torts, § 774................................................... 4

ii

WARNER AND CONVIVIA'S MOTION TO
DISMISS FIRST CAUSE OF ACTION

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Plaintiff Sharman Networks Limited ("SNL") fails, in its First Amended Complaint ("FAC"), to state a cognizable claim for tortious interference with contractual relations as a matter of law.  The claim is insufficient on two independent grounds.  First, the relevant terms of SNL's EULA are unenforceable as a matter of law as they are preempted by the Copyright Act and the first sale doctrine embodied therein.  Since the relevant contract terms are not enforceable, Defendants Warner and Convivia cannot, as a matter of law, be liable for tortious interference with contractual relations.  Second, by SNL's own prior admissions, the so-called EULA does not constitute valid contract enforceable under California law.  Since there is no contract between SNL and its end users, Defendants Warner and Convivia cannot, as a matter of law, be liable for tortuous interference with contractual relations.

### II.   BACKGROUND

#### A.   Diet K and the Kazaa Media Desktop

As Plaintiff's FAC charges, Defendant Chip Warner is the creator of a program named "DietK" that enables users to operate Plaintiffs' Kazaa Media Desktop Software ("KMD")—a program that enables peer-to-peer ("P2P") communications over the Internet—without the Embedded Third-Party Software that typically accompanies KMD.  (FAC ¶¶ 1-2, attached as Exhibit A to the Tehranian Declaration.)  The Embedded Third-Party Software that accompanies KMD is "bundled advertising delivery software applications and search utilities that present advertising to end users and provide users with Internet search functionality."  (FAC ¶ 11.)  As SNL maintains, this Embedded Third-Party Software delivers targeted advertising to users of KMD and enables SNL to generate significant advertising revenues.  (FAC ¶ 16.)

1

1   DietK therefore un-bundles the KMD from the Embedded Third-Party

2   Software, giving users the option of removing unwanted Embedded Third-Party

3   Software—software that, by SNL's own admission, covertly gathers user

4   information through the user's Internet connection and then transmits that

5   information in the background to someone else, accumulating personal information

6   of value to surreptitious Internet advertising companies.  (FAC ¶ 11.)  It is

7   universally acknowledged by the Internet cognoscenti that such Embedded Third-

8   Party Software—more colloquially referred to by Internet users as "spyware"—can

9   tax a computer's memory resources and use up precious bandwidth, even

10  completely destroying a computer's ability to function properly:

> Because spyware is using memory and system resources, the applications running in the background can lead to system crashes or general system instability. . . . Because spyware exists as independent executable programs, they have the ability to monitor keystrokes, scan files on the hard drive, snoop other applications, such as chat programs or word processors, install other spyware programs, read cookies, change the default home page on the Web browser, consistently relaying this information back to the spyware author who will either use it for advertising/marketing purposes or sell the information to another party.  Licensing agreements that accompany software downloads sometimes warn the user that a spyware program will be installed along with the requested software, but the licensing agreements may not always be read completely because the notice of a spyware installation is often couched in obtuse, hard-to-read legal disclaimers. (*See* Webopedia Computer Dictionary Definition of "Spyware," attached as Exhibit D to the Tehranian Declaration.)

20  DietK simply gives computer users the option of removing unwanted Embedded

21  Third-Party Software from their computers.  It therefore functions as an automated

22  anti-virus program that allows users to manage their desktop and decided what

23  programs they want or do not want on their computer.

24  **B.    SNL's First Cause of Action**

25      SNL's first cause of action charges Warner and Convivia with tortious

26  interference with contractual relations.  As SNL maintains, users of KMD form a

27  End User Licensing Agreement ("EULA") with SNL that, *inter alia*, acknowledges

28  that they will not "disable, remove, block, prevent the functioning of, or otherwise

4946                                    2          **WARNER AND CONVIVIA'S MOTION TO**
                                                    **DISMISS FIRST CAUSE OF ACTION**

1  interfere with any of the Embedded Third Party Software" so long as they have not
2  entirely deleted KMD from their computer.  (FAC ¶ 13.)  SNL argues that, by
3  removing or preventing the "functioning of KMD's Embedded Third Party
4  Software," (FAC ¶ 21), DietK enables users of KMD to violate the terms of the
5  EULA.

6  **III.    RULE 12 STANDARDS**

7         A Rule 12(b)(6) dismissal for failure to state a claim upon which relief can be
8  granted is proper where, assuming the facts as alleged are true, there is no
9  "cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699
10  (9th Cir. 1990).  Specifically, if a state law claim is preempted by federal law,
11  12(b)(6) dismissal is appropriate.  *California ex rel. Lockyer v. Dynergy, Inc.*, 375
12  F.3d 831, 852-53 (9th Cir. 2004).  Additionally, failure to plead facts sufficient to
13  allege a required element of a claim constitutes the basis for a proper 12(b)(6)
14  dismissal.  *Lopez v. Smith*, 160 F.3d 567, 571 (9th Cir. 1998) *opinion withdrawn on*
15  *others grounds by Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000).

16  **IV.    DISCUSSION**

17         To state a claim for intentional interference with contract, a plaintiff must
18  allege:  (1) the existence of a valid contract; (2) defendant knew of the contract and
19  intended to induce its breach by way of interference; (3) the contract was in fact
20  breached; (4) the breach was proximately caused by defendant's interference; and
21  (5) resulting damage.  *See Richardson v. La Rancherita La Jolla, Inc.*, 98 Cal. App.
22  3d 73, 81 (1980).  In the instant case, there is no valid, enforceable contract for two
23  distinct reasons.  Each is discussed below.

24  **A.    Plaintiff's Interference with Contract Claim Fails as a Matter of**
25  **Law Because the Cause of Action Is Preempted Under the Federal**
     **Copyright Act.**

26         The Restatement (Second) of Torts provides that "[o]ne who by appropriate
27  means causes the nonperformance of an illegal agreement or an agreement having a
28

1  purpose or effect in violation of an established public policy is not liable for
2  pecuniary harm resulting from the nonperformance." *See* Restatement (Second) of
3  Torts, § 774. Thus, there can be no tortious interference with a contract if the
4  underlying contract is itself unenforceable as a matter of public policy. In the
5  instant case, enforcement of the terms of SNL's EULA is preempted by the
6  Copyright Act and, specifically its first sale doctrine. As a consequence, as a matter
7  of law, there is no cognizable action for tortious interference with contract relations
8  available to SNL as a matter of law.

9      First, the Copyright Act preempts state law contracts claims conflicting with
10  rights protected under federal law. As the Supreme Court has noted, "State action
11  may be foreclosed by express language in a congressional enactment, . . . by
12  implication from the depth and breadth of a congressional scheme that occupies the
13  legislative field, . . . or by implication because of a conflict with a congressional
14  enactment." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001) (citations
15  omitted). "The clearest indication that federal law supplants state law is a statutory
16  preemption provision. When Congress expressly codifies its preemptive intent in
17  statutory form, our analysis 'begins with the language of the statute.'" *Jones v.*
18  *Vilsack*, 272 F.3d 1030, 1034 (8th Cir. 2001) (citing *Lorillard Tobacco Co. v. Reilly*,
19  533 U.S. 525, 541 (2001)). Federal law explicitly provides for preemption of state
20  law claims that clash with the strictures of copyright protection. As section 301(a)
21  of the Copyright Act states, "all legal or equitable rights that are equivalent to any
22  of the exclusive rights within the general scope of copyright . . . are governed
23  exclusively by this title." 17 U.S.C. § 301(a).

24      As courts have repeatedly held, enforcement of any provision of a software
25  licensing agreement that conflicts with a federally protected right under the
26  Copyright Act is impossible on preemption grounds. Thus, in *Vault Corp. v. Quaid*
27  *Software, Ltd.*, 847 F.2d 255 (5th Cir. 1988), a federal circuit court deemed a
28  software licensing agreement invalid because the Louisiana License Act, with

1  which the licensing agreement complied, was preempted by the federal Copyright

2  Act. The court held that the provision of the Louisiana Act which "permits a

3  software producer to prohibit the adaptation of a licensed computer program by

4  decompilation or disassembly, conflicts with the rights of computer program

5  owners under § 117 and clearly touches upon an area of federal copyright law." *Id.*

6  at 270.

7       Here, enforcement of the EULA is preempted by federal copyright law's first

8  sale doctrine. As the Supreme Court has cautioned, "The Copyright Act must be

9  construed in light of its basic purpose of 'promoting broad public availability of

10  literature, music, and other arts.'" *Twentieth Century Music Corp. v. Aiken*, 422

11  U.S. 151, 156 (1975). The first sale doctrine—a fundamental element of the federal

12  copyright scheme—is specifically designed to promote such broad public access to

13  copyright works. Under the first sale doctrine, "the owner of a particular copy . . .

14  lawfully made . . . is entitled, without the authority of the copyright owner, to sell

15  or otherwise dispose of the possession of that copy." *See* 17 U.S.C. § 109(a). The

16  first sale doctrine therefore holds that "a sale of a lawfully made copy terminates a

17  copyright holder's authority to interfere with subsequent sales or distribution of that

18  particular copy." *Adobe Sys. Inc. v. One Stop Micro, Inc.*, 84 F. Supp. 2d 1086,

19  1089 (N.D. Cal. 2000). *See also American Int'l Pictures, Inc. v. Foreman, 576 F.2d*

20  *661, 663-64 (5th Cir. 1978)* (noting that the first sale doctrine "extinguishes the

21  copyright holder's ability to control the course of copies placed in the stream of

22  commerce").

23       Specifically, as the precedent of this and other courts indicates, the first sale

24  doctrine protects the ability of end users to take a group of software programs

25  distributed to them and to un-bundle these programs. This is precisely the behavior

26  that SNL's first cause of action targets. As SNL charges in its FAC, Warner and

27  Convivia, through the DietK program, enable end users of SNL's Kazaa Media

28  Desktop (KMD) to "remove or prevent the functioning of KMD's Embedded Third

Party Software." (FAC ¶ 21.)  However, under the first sale doctrine, end users have a right protected by federal law to un-bundle the KMD from the other third party software that is distributed to them *en masse* with KMD.

This Court's holding in *Softman Productions Co., LLC v. Adobe Systems, Inc.*, 171 F. Supp. 2d 1075 (C.D. Cal. 2001), is squarely on point.  In the case, Adobe Systems claimed that the unbundling and subsequent redistribution of a package of software that it licensed to end-users constituted a violation of express EULA terms forbidding the practice.  But the Court rejected Adobe's claims on first sale doctrine grounds.

> The terms of the Adobe EULA at issue prohibit licensees from transferring or assigning any individual Adobe product that was originally distributed as part of a Collection unless it is transferred with all the software in the original Collection.  This license provision conflicts with the first sale doctrine in copyright law, which gives the owner of a particular copy of a copyrighted work the right to dispose of that copy without the permission of the copyright owner.

*Id.* at 1083.

Thus, on preemption grounds, the Court found Adobe's EULA unenforceable.  As the Court noted, "A system of 'licensing' which grants software publishers this degree of unchecked power to control the market deserves to be the object of careful scrutiny." *Id.* at 1091.  Thus, notwithstanding Adobe's inclusion of an End User License Agreement barring un-bundling, Softman Productions—a party who obtained the collection of Adobe software without entering into the EULA and then proceeded to un-bundle its various components for resale—had its activities fall within the shelter of the first sale doctrine.  *Id.*

This Court's finding in *Softman* controls the instant case.  DietK merely facilitates the un-bundling of the core KMD program from third-party vendor software packaged with KMD by SNL.  As a result, what DietK does is no different

1   than the activity that this Court ruled protected under the first sale doctrine in

2   *Softman Productions.*

3   　　Other cases issued prior to the advent of the Internet era are similarly

4   instructive. In *Burke & Van Heusen, Inc. v. Arrow Drug, Inc.*, 233 F. Supp. 881

5   (E.D. Pa. 1964), for example, the plaintiff granted to a third party the right to

6   manufacture phonograph records of plaintiff's musical compositions, provided that

7   such records might be sold only as a premium in connection with the sale of a

8   certain shampoo. *See id.* at 882. The third party sold the records with the shampoo

9   to the defendant, which in turn sold the records separately from the shampoo. *See*

10  *id.* The court found that, despite the existence of a contract between plaintiff and

11  the third party, the defendant could not be held liable for un-bundling the record

12  from the shampoo. *See id.* at 884. The court reached this conclusion

13  notwithstanding an assumption that defendant knew of the restrictions on sales that

14  were part of the license between plaintiff and defendant's supplier. *See id.*

15  Specifically, the first sale doctrine protected the defendant's activities.

16  　　All told, pursuant to the first sale doctrine codified in the Copyright Act, the

17  ability to un-bundle licensed software products is protected under federal law.

18  SNL's contract with its end users, then, is unenforceable to the extent it prohibits

19  unbundling. Thus, any action that, as here, is premised on an interference with

20  contract claim is preempted by the Copyright Act's trust sale doctrine. This Court

21  should therefore adjudicate the matter as a question of law under Rule 12(b)(6) and

22  dismiss Plaintiffs' first cause of action.

23  **B.　Plaintiff's Interference with Contract Claim Fails as a Matter of**

24  **Law Because, by Plaintiff's Own Admissions, There Is No Valid**
    **Underlying Contract to Enforce.**

25

26  　　SNL's prior admissions before this Court as a defendant in a related suit,

27  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, Case No. CV 01-8541-SVW

28  (PJWx) (C.D. Cal), defeat SNL's first cause of action in the instant case. In

7

1    *Grokster* – one of the highest profile intellectual property suits in recent memory –

2    members of the Recording Industry Association of America ("RIAA") continued

3    their battle against illegal peer-2-peer ("P2P") file sharing on the Internet by suing

4    SNL for copyright infringement.  SNL moved to dismiss all the copyright claims

5    against it by arguing that the California/U.S. courts lacked subject matter and

6    personal jurisdiction over it and the claims.

7        SNL specifically asserted, *inter alia*, that it did not possess sufficient contacts

8    with the state of California for the exercise of jurisdiction.  The plaintiffs contended

9    that SNL had contracted with California residents through its EULA.  But Sharman

10   demurred, stating that the EULA constituted nothing more than "passive

11   notification" to potential customers of the terms of the software's use, and that such

12   click-wrap agreements are insufficient to support personal jurisdiction over SNL in

13   the California courts.  *See MGM Studios Inc. v. Grokster, Ltd.*, 243 F. Supp. 2d

14   1073, 1087 n.8 (C.D. Cal. 2003).  Factual assertions made by a party in briefs and

15   pleadings constitute judicial admissions binding before trial and appellate courts.

16   *See American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988).

17   SNL's binding assertion in these filings defeat, as a matter of law, its ability to

18   pursue its tortious interference with contract claim against Warner and Convivia.

19       In its filings, Sharman characterized its EULA as nothing more than a

20   "passive notification by Sharman to potential users of the software of the terms of

21   use, including the requirement that users observe the copyright laws in force in the

22   counties in which they are resident."  (Reply Memorandum in Support of Sharman

23   Networks Limited Motion to Dismiss at 11, attached as Exhibit B to the Tehranian

24   Declaration.)  As SNL proceeded to argue, such a "click-wrap" agreement is

25   insufficient to support personal jurisdiction.  (Reply Memorandum at 11.)  Simply

26   put, SNL characterized their so-called EULA as nothing more than notification of

27   "terms of use" that that served to require "potential users to promise not to violate

28   copyrights or any local laws before they could install the Kazaa Media Desktop

        8        **WARNER AND CONVIVIA'S MOTION TO<br>DISMISS FIRST CAUSE OF ACTION**

1   ("KMD") software." (Reply Memorandum at 3.)  Critically, SNL made this

2   argument to escape personal jurisdiction over SNL based upon SNL's entry into a

3   contract with California residents.

4         Based on the foregoing admissions, SNL therefore averred that it conducts no

5   purposefully directed business with California residents from its website or

6   otherwise. (Reply Memorandum at 11-12; *see also* Supplemental Declaration of

7   Nicola Hemmings in Support of Defendant LEF Interactive and Sharman Networks

8   Limited Motions to Dismiss First Amended Complaint for Lack of Personal

9   Jurisdiction, Improper Venue, and Forum Non Conveniens at ¶11, attached as

10  Exhibit C to the Tehranian Declaration.)  And of course, had SNL entered a

11  binding, legitimate contract in California, then personal jurisdiction would exist.

12  *See McGee v. International Life Ins. Co.*, 355 U.S. 220, 223 (1957) (finding that

13  corporation's entrance into a life insurance contract with a California resident was

14  sufficient to create substantial ties with California and give rise to personal

15  jurisdiction).  As a consequence, it is simply impossible for Warner and Convivia to

16  be said to be interfering with commercial opportunities in California if, as SNL has

17  previously asserted, it has never purposefully availed itself of such opportunities in

18  California nor formed sufficient contacts with California residents to establish

19  contractual claims sufficient to be heard before the California courts.  Put

20  differently, SNL should be held to its hard fought judicial admission that it does not

21  have contracts in the United States that give rise to personal jurisdiction.  There is

22  therefore no contract with which Warner and Convivia can be sued for interference.

23  As such, SNL's first cause of action for tortious interference with contractual

24  relations fails as a matter of law.

25

26

27

28

1

## V.   <u>CONCLUSION</u>

2    For the foregoing reasons, the Court should dismiss with prejudice Sharman

3  Network Limited's first cause of action for tortious interference with contractual

4  relations with prejudice.

5

6  Dated:   October 19⁄⁴ 2004          TURNER GREEN AFRASIABI
                                       & ARLEDGE LLP
7                                      PETER AFRASIABI
8                                      JOHN TEHRANIAN

9

10                                     _____

11                                     John Tehranian
                                       Attorneys for Defendants
12                                     CHIP WARNER and CONVIVIA, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF ORANGE

        I am employed in the county of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 535 Anton Boulevard, Suite 850, Costa Mesa, California 92626.

        On October 19, 2004 I served the document (s) described as **WARNER AND CONVIVIA, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS WITH PREJUDICE PLAINTIFF SHARMAN NETWORKS LIMITED'S FIRST CAUSE OF ACTION IN THE FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** in this action by placing the true copies thereof enclosed in sealed envelopes addressed as follows:

John M. Genga, Esq.
GENGA & ASSOCIATES, P.C.
15821 Ventura Boulevard, Suite 525
Encino, CA  91436
*Attorneys for Sharman Networks*
*Limited and Sharman License Holdings*
*Limited*
FAX: (818) 444-4520

[ ]        (BY MAIL) I am "readily familiar" with the firm's practice for collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Costa Mesa, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ]        (BY FAX) I transmitted, pursuant to Rules 2001 *et seq.*, the above-described document by facsimile machine (which complied with Rule 2003 (3), to the above-listed fax number (s).  The transmission originated from facsimile phone number (714) 434-8756 and was reported as complete and without error.  The facsimile machine properly issued a transmission report, a copy of which is attached hereto.

[X]        (BY OVERNIGHT DELIVERY) I caused said envelope (s) to be delivered overnight via an overnight delivery service in lieu of delivery by mail to the addressee (s).

[ ]        (PERSONAL) I caused _____ to personally serve the addressee(s).

        Executed on October 19, 2004 at Costa Mesa, California.

[ X ]        (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_____
Robin Golder

4946